FILED

12/02/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0473

DA 24-0473

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 275

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JAY DEE DAVISSON,

      Defendant and Appellant.


APPEAL FROM:    District Court of the Second Judicial District,
In and For the County of Butte-Silver Bow, Cause No. DC-21-19
Honorable Robert J. Whelan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Colin M. Stephens, Stephens Brooke, P.C., Missoula, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Thad Tudor, Assistant
Attorney General, Helena, Montana

          Matthew Enrooth, Butte-Silver Bow County Attorney, Butte,
Montana


Submitted on Briefs:  September 3, 2025

Decided:  December 2, 2025

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Jay Dee Davisson (Davisson) appeals from his June 17, 2024 Judgment and Order of Commitment following a jury verdict of guilty of one count of sexual intercourse without consent (SIWOC), in violation of § 45-5-503, MCA, in the Second Judicial District Court, Butte-Silver Bow County. We affirm.

¶2 Davisson raises two issues on appeal, which we restate as follows:

*Issue One: Whether the District Court committed plain error by providing a jury instruction which included an erroneous definition of "knowingly."*

*Issue Two: Whether Davisson's counsel was ineffective for stipulating to the incorrect mental state instruction.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On July 27, 2020, 15-year-old T.K. and two friends, teenaged H.R. and twenty-year-old Brylee Lewis (Lewis), left a Butte, Montana, house party, where they had been drinking and smoking marijuana, to find someone old enough to purchase more alcohol for them. They found 45-year-old Davisson, the father of a mutual friend, who was living in a hotel in Rocker, Montana. Davisson purchased the girls a 24-pack of alcoholic malt beverages. T.K. had never met Davisson prior to this night.

¶4 Several days later, after midnight on August 2, 2020, T.K., H.R., and Lewis were again drinking at a house party in Butte. Lewis, joined by T.K., took a walk away from the party to avoid an ex-boyfriend. Lewis later testified that she was "pretty drunk" when she left the party with T.K., who was also at that point intoxicated. A vehicle flashed its lights at the girls, and T.K. approached. She recognized the driver as Davisson. Lewis asked Davisson, who she believed was also "probably intoxicated," to drive them to a gas

2

station for more alcohol. He drove them again to Rocker. All three entered the store. Lewis and T.K. returned to the car to wait for Davisson. T.K. remembered sitting in the back seat. Davisson returned with a bottle of whiskey, from which T.K. took a drink. After leaving the gas station in Rocker, Davisson drove the girls back to Butte.

¶5 From here, T.K.'s memories become vague. She could not recall telling Davisson her age. She recalled Davisson and Lewis inviting her to sit up front with them during the drive back to Butte, which she did. She remembered feeling intoxicated. She recalled taking another drink of whiskey before Lewis grabbed her thigh and pulled her onto her lap. After that moment, T.K. remembered nothing else until she woke up the next morning.

¶6 During the drive, Lewis remembered the conversation shifting to "sexual" topics and remembers both Davisson and T.K. touching her. Lewis and T.K. became physical, and Lewis digitally penetrated T.K.[1] Lewis remembered Davisson began touching T.K. and he tried "to put his penis in her[,]" but she could not recall if they had sex in the car or if Davisson ejaculated. Lewis's memories were hazy; she recalled she was still wearing pants, but not a shirt. Lewis claimed T.K. was not wearing a shirt and, at some point, her pants were removed. She remembered Davisson also digitally penetrated T.K. Davisson remained fully clothed. Lewis asked Davisson to take her home, which he did. She tried to convince T.K. to stay with her, but Lewis was worried she would be unable to assist T.K. up the stairs to her apartment due to the intoxicated state of both girls. Upon dropping Lewis off at her apartment, T.K. and Davisson left together.

---

[1] Lewis was legally an adult but was granted immunity for her contact with T.K. in exchange for her testimony.

¶7    After dropping Lewis off at her apartment, Davisson returned to his hotel in Rocker with T.K. Security camera footage from the hotel played at trial shows Davisson arriving at 5:37 a.m. Hotel cameras recorded Davisson walking around the hotel before moving his car to a side door. He moved his car to several other parking locations, with intervening entries and exits from the hotel, until eventually parking near a side entrance. At 6:48 a.m., he was recorded carrying T.K. into the hotel. T.K., as seen on the surveillance video, was completely limp, barefoot, and her face and head were covered with a dark-colored shirt. Davisson later recalled T.K. appearing severely intoxicated and taking her clothes off before leaving her to sleep on the bed. Before leaving the hotel that morning, Davisson left T.K. a note with his name and phone number as well as a toothbrush and $30 in cash for a cab back to Butte.

¶8    T.K. remembered waking up around 2:00 p.m., wearing neither pants nor underwear. The shirt she was wearing was not hers. She was confused and scared. Having lost her cell phone, she called Davisson using the hotel phone but could not recall the details of their conversation other than telling him to "essentially F off." A hotel employee who interacted with T.K. remembered her being "very emotional" when she came to the lobby to wait for a cab. A cab took T.K. to Lewis's apartment in Butte, where one of Lewis's neighbors gave T.K. a ride to her car. T.K. returned to her home, where her father was upset after she had failed to return home the previous night. T.K. then went to H.R.'s house, but H.R. was not home. T.K. waited there. At this point, T.K. was feeling soreness in "[her] vagina and [her] bottom." When H.R.'s mother, Terri Jo, returned to H.R.'s house, she convinced T.K. to go with her to the hospital.

4

¶9     At the hospital, T.K. was taken to a room to wait for a Sexual Assault Nurse Examiner (SANE). She began vomiting. Her head "was just pounding really, really bad." Terri Jo, unable to accompany an unrelated minor into the examination room, called T.K.'s parents, who came to the hospital. A SANE nurse administered a rape kit, took photos of T.K. genitals, and performed DNA swabs of T.K.'s vagina and anus. The SANE nurse testified that T.K.'s genitals were sensitive to the touch. The SANE nurse also took photos of "fresh, new bruise[s]" on T.K.'s wrist and inner thigh. Both DNA swabs matched Davisson's DNA with a statistical probability of 1 in 15.6 nonillions. T.K. was positive for THC and the results detected methamphetamine in her system. The toxicology report did not indicate alcohol. Given the elapsed time between when T.K. stopped drinking and the administration of the test, this was not an unexpected result and would not rule out T.K.'s admitted consumption of alcohol during the previous night. T.K. denied using methamphetamine.

¶10    Lewis initially told law enforcement that T.K. told Davisson she was 20 years old but admitted this was a lie in her trial testimony. However, Lewis testified at trial that T.K. and H.R. had told Davisson their true age when he first purchased alcohol on July 27 for them. She also told investigators that T.K. appeared to have "blacked out" from intoxication.

¶11    Detective Joshua Stearns (Det. Stearns) interviewed Davisson, who recalled his first meeting with the girls on July 27 and his belief that they were 20 years old. He further claimed T.K. represented herself to be 24 years of age on a social media account and that she also had a fake ID. He recalled T.K. whispering in his ear that she was 20 years old.

5

He believed that T.K. was older than 16 based on the way she was "sexually acting," being out late at a party and intoxicated, and his perception that she was more sexually mature than Lewis. Davisson claimed he was shocked at learning T.K.'s real age. Davisson's recollection of the events of August 2 to Det. Stearns involved him leaving a bar to go to a friend's house, at which point he encountered B.L. and T.K. who asked him for a ride. He claimed he had been drinking and probably should not have been driving. He recalled having sex with T.K. in his car and ejaculating.

¶12 The State charged Davisson with SIWOC. During trial, the State advanced a two-pronged theory of the case: that T.K. was incapable of consent due to her age and that her intoxication rendered her physically helpless. Davisson did not testify. Davisson's attorney and the State stipulated to, relevant here, the following jury instruction: "A person acts knowingly when the person is aware that there exists the high probability that a person's conduct will cause a specific result." The jury returned a verdict finding Davisson guilty of SIWOC. The jury, through a special verdict form, specifically found that Davisson was guilty beyond a reasonable doubt of SIWOC because T.K. was under the age of 16 and that he was guilty beyond a reasonable doubt because T.K. was incapacitated. Davisson now appeals.

**STANDARDS OF REVIEW**

¶13 We generally do not review issues raised for the first time on appeal, but when a defendant asserts an error implicating a fundamental right, we may choose to invoke plain error review where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or

6

proceedings, or may compromise the integrity of the judicial process. *State v. Deveraux*, 2022 MT 130, ¶ 21, 409 Mont. 177, 512 P.3d 1198 (citing *State v. Favel*, 2015 MT 336, ¶ 13, 381 Mont. 472, 362 P.3d 1126).

¶14 We review jury instructions given by a district court for abuse of discretion. *Deveraux*, ¶ 20. Our review concerns whether the instructions, taken as a whole, fully and fairly instruct the jury as to the applicable law. *Deveraux*, ¶ 20 (citation omitted). "'If the instructions are erroneous in some aspect, the mistake must prejudicially affect the defendant's substantial rights in order to constitute reversible error.'" *Deveraux*, ¶ 20 (quoting *State v. Gerstner*, 2009 MT 303, ¶ 15, 353 Mont. 86, 219 P.3d 866).

¶15 Ineffective assistance of counsel claims are mixed questions of law and fact which we review de novo. *State v. Secrease*, 2021 MT 212, ¶ 9, 405 Mont. 229, 493 P.3d 335.

**DISCUSSION**

¶16 *Issue One: Whether the District Court committed plain error by providing a jury instruction which included an erroneous definition of "knowingly."*

¶17 Davisson's attorney stipulated to a jury instruction providing the result-based definition of knowingly. Davisson now asks this Court to exercise plain error review and reverse his conviction for SIWOC on the basis that, by providing the jury with the result-based definition of knowingly, the District Court violated his right to due process and relieved the State of its burden to prove each element of SIWOC.

¶18 Failure to object at trial generally constitutes a waiver of the right to seek appellate review and this Court generally does not review issues raised for the first time on appeal. *Deveraux*, ¶ 38 (citations omitted). However, this Court may, in its discretion, review an

7

unpreserved error under the "narrow exception of plain error review." *Deveraux*, ¶ 38. We apply it sparingly, on a case by case basis, in situations where, considering the totality of the circumstances of each case, the defendant 1) has demonstrated that the asserted error implicates a fundamental right and 2) firmly convinces this Court that a failure to review the asserted error would result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *Deveraux*, ¶ 21 (citation omitted).

¶19 "A person who knowingly has sexual intercourse with another person without consent or with another person who is incapable of consent commits the offense of sexual intercourse without consent." Section 45-5-503(1), MCA. A person is incapable of giving consent when the person is "incapacitated[,]" "physically helpless[,]" or "less than 16 years old." Section 45-5-501(1)(a)(i), (ii), (iv), MCA. We have previously held the conduct-based definition of "knowingly" is the correct jury instruction in a SIWOC case. *State v. Rowe*, 2024 MT 37, ¶ 31, 415 Mont. 280, 543 P.3d 614; *Deveraux*, ¶ 32; *see also Gerstner*, ¶ 29. "Knowingly," under § 45-5-503(1), MCA, applies to "sexual intercourse" and "without consent," and requires a conduct-based definition; that is, "a person acts knowingly with respect to conduct or to a circumstance . . . when the person is aware of the person's own conduct or that the circumstance exists." Section 45-2-101(35), MCA; *see also Rowe*, ¶ 31 (quoting *Gerstner*, ¶ 27) ("The conduct-based instruction is the most appropriate since '[i]t is the particularized conduct of making sexual contact that the [SIWOC] statute makes criminal.'").

¶20 Here, the District Court indeed submitted the incorrect "result" definition of "knowingly" to the jury and should have provided the "conduct" definition. The incorrect jury instruction implicated Davisson's fundamental rights to a fair trial, thus satisfying the first prong of our plain error analysis. *Deveraux*, ¶ 37.

¶21 However, whether the incorrect instruction merits reversal of Davisson's conviction turns on whether Davisson was prejudiced by the incorrect instruction. In arguing the incorrect instruction prejudiced him, Davisson relies on *State v. Hamernick*, 2023 MT 249, 414 Mont. 307, 545 P.3d 666. There, the district court segmented the offense of SIWOC into two elements ("has sexual intercourse" and "without consent") and ascribed different mental state instructions for each, supplying the jury with the "conduct-based definition of knowingly" for "has sexual intercourse" and the "high-probability-of-a-fact definition of knowingly" for "without consent." *Hamernick*, ¶ 18. Hamernick had testified in his own defense, admitting he had engaged in sexual intercourse but denying any "aware[ness] his conduct was against [the alleged victim's] will." *Hamernick*, ¶ 20. This Court reversed Hamernick's conviction on the basis the district court had erred by providing the "high-probability-of-a-fact" definition of "knowingly" for the element of "without consent" rather than the conduct-based definition. *Hamernick*, ¶ 27 (citing *Deveraux*, ¶ 20). By providing such an instruction, the court improperly lessened the State's burden of proving "Hamernick knew his sexual conduct with [the victim] was without her consent" to proving his mere "aware[ness] of a high probability" the victim did not consent to sexual intercourse. *Hamernick*, ¶ 23. In reversing Hamernick's conviction, we concluded the lighter burden of proof created by the incorrect jury instruction prejudiced the defendant's

9

rights because, even if the jury believed Hamernick's testimony regarding an encounter he believed was consensual, the incorrect instruction could allow the jury to find he "should have been aware of the high probability of the fact that [the victim] had not consented to his sexual advances." *Hamernick*, ¶¶ 20, 27.

¶22 Nonetheless, an incorrect jury instruction on its own does not constitute prejudice. *Deveraux*, ¶ 41. In *Deveraux*, in addition to delineating the proper "knowingly" definition for SIWOC, we also considered an incorrect jury instruction defining "consent." *Deveraux*, ¶ 27. Devereaux did not object to a jury instruction that utilized the 2017 definition of consent rather than the correct 2013 definition in effect at the time Deveraux committed SIWOC. *Deveraux*, ¶ 35. Under the correct 2013 formulation, the State would have needed to prove "Deveraux used force to compel [the victim] to submit to sexual intercourse," in contrast to the 2017 definition which reduced the state's burden by not requiring the State prove force. *Deveraux*, ¶ 35. Still, we declined to exercise plain error review of his conviction "because the evidence and arguments presented at trial, despite the incorrect instruction, nonetheless required the jury to resolve the requisite factual issue of whether Deveraux had used force." *Deveraux*, ¶ 40. The court there heard extensive testimony regarding Deveraux's "infliction, attempted infliction, or threatened infliction of bodily harm" and "numerous instances of forceful, violent intercourse against [the victim's] will." *Deveraux*, ¶ 40. Ultimately, the incorrect instruction did not prejudice Deveraux. *Deveraux*, ¶ 41.

¶23 Here, the State presented evidence Davisson had sex with T.K. despite knowing she was 15 years old and, perhaps most importantly, that T.K.'s intoxication rendered her

10

incapable of consent. Hotel footage showed Davisson waiting an hour before carrying an obviously physically helpless T.K. into his hotel through a discreet side entrance. The jury further heard T.K. testifying to not remembering anything after she ended up in Lewis's lap. Lewis likewise testified to the severity of T.K.'s intoxication. There is no dispute that T.K. had been drinking heavily in the lead up to Davisson having sex with her. Similar to *Deveraux*, the evidence and arguments presented at trial required the jury to resolve whether Davisson was aware T.K. could not consent due to her age and intoxication. The jury inferred, from all the facts and circumstances of the case, that the defendant engaged in sexual intercourse without the victim's consent. *Hamernick*, ¶ 26. By use of a special verdict form, the jury found that under either theory offered by the State, Davisson was guilty of *both* SIWOC based on T.K.'s intoxication and because Davisson knew she was under 16 years of age. We conclude that, from the evidence presented, the jury rendered its verdict based upon evidence presented that Davisson knowingly engaged in sexual intercourse with T.K. despite an awareness she was incapable of consent either due to her age or incapacitation. *See Deveraux*, ¶ 40. Thus, Davisson was not prejudiced by the incorrect jury instruction, which "still considered the right issue in spite of the wrong instruction." *Deveraux*, ¶ 41. Accordingly, we decline to exercise plain error review of the incorrect instruction because we are not firmly convinced that declining to do so would affect the fairness, integrity, or public reputation of judicial proceedings.[2]

---

[2] Davisson has filed a Notice of Supplemental Authority directing this Court's attention to our November 12, 2025 decision *State v. Pierce*, 2025 MT 257, ___ Mont. ___, ___ P.3d ___. However, in *Pierce* the defendant proposed the correct "knowingly" jury instruction but the State's incorrect proposed instruction prevailed. *Pierce*, ¶ 15. We were not required to exercise plain

¶24    *Issue Two: Whether Davisson's counsel was ineffective for stipulating to the incorrect mental state instruction.*

¶29    In the alternative, Davisson asserts he was denied effective assistance of counsel on the basis his attorney should not have stipulated to the erroneous jury instruction. Criminal defendants are guaranteed effective assistance of counsel. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861 (citing U.S. Const. amend. VI; U.S. Const. amend. XIV; Mont. Const. art. II, § 24). To succeed on an ineffective assistance of counsel claim, the defendant must prove two elements. *Whitlow*, ¶ 10 (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). First, the defendant must prove that counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Second, the defendant must prove that this deficient performance prejudiced their case. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. If the defendant fails to satisfy one of the *Strickland* prongs, there is no need to address the other prong. *Whitlow*, ¶ 11. An attorney's performance is measured for deficiency by "whether counsel's conduct fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Whitlow*, ¶ 20.

¶30    Here, we have already determined Davisson was not prejudiced by the incorrect jury instruction. We likewise decline to find prejudice to Davisson due to his attorney stipulating to that same incorrect jury instruction. Given the substantial evidence presented at trial regarding T.K.'s incapacity, including testimony of Det. Stearns relating to

---

error review to reach the issue. *Pierce*, ¶ 19. Here, based on the evidence in this case, we decline to exercise plain error review to reach the same error that occurred in *Pierce*, although we acknowledge the similarity between the cases.

Davisson's admission to having sexual intercourse with her,[3] Davisson cannot demonstrate a reasonable probability that, but for counsel's error, the results of his trial would have been different. *Deveraux*, ¶ 42 (citation omitted).

## CONCLUSION

¶25     Davisson cannot demonstrate he was prejudiced by the incorrect jury instruction and we thus decline to exercise plain error review of the incorrect jury instruction. Absent a showing of prejudice, we likewise decline to find Davisson's counsel was deficient. His conviction is affirmed.

¶26     Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

---

[3] Davisson did not object to this testimony at trial and does not challenge the admission of Det. Stearns's summary of his investigatory interview as plain error or the result of ineffective assistance of counsel now on appeal. We similarly do not address counsel's decision to not object here.